NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250087-U

NO. 4-25-0087

IN THE APPELLATE COURT

FILED
August 4, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| KELTON C. GALMORE, | ) | No. 22CF150 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, finding:

(1) Defendant did not establish ineffective assistance of counsel based on defense counsel's failure to object to foundation for the admission of evidence of defendant's phone number and Snapchat account.

(2) Defendant did not establish ineffective assistance of counsel based on the admission of a codefendant's cell phone location records.

(3) Defendant forfeited his arguments regarding foundation for his AT&T cell phone records and evidence concerning the use of CellHawk software.

(4) Defense counsel's failure to object to the prosecutor's comments in closing argument did not constitute ineffective assistance of counsel.

(5) Defense counsel's withdrawal of a motion to sever defendant's trial from that of his codefendants did not constitute ineffective assistance of counsel.

(6) The trial court did not abuse its discretion in allowing the prior consistent statement of a State's witness, and defendant failed to establish ineffective assistance of counsel based on defense counsel's failure to request a limiting

instruction for the statement.

(7) The trial court did not err in finding defense counsel's objection to the admission of Comcast door logs was untimely, and defendant did not establish ineffective assistance of counsel based on defense counsel's failure to timely object.

(8) The record is not sufficiently developed to address defendant's claim his sentence, as applied, violates the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11) and, therefore, his claim is premature.

¶ 2       Following a September 2024 trial, a jury found defendant, Kelton C. Galmore, guilty of (1) the first degree murders of Bryant Williams, Savante English, and Keyera Gant (720 ILCS 5/9-1(a)(1), (2), (3) (West 2020)), (2) armed robbery (*id.* § 18-2(a)(1)), and (3) armed violence (*id.* § 33A-2). The trial court sentenced defendant to a mandatory life sentence for the first degree murder convictions, to run concurrently with a 30-year sentence for the armed violence conviction. The armed robbery conviction merged into the first degree murder convictions for sentencing.

¶ 3       On appeal, defendant argues (1) he was denied the effective assistance of counsel when defense counsel failed to object to (a) the admission of evidence of defendant's cell phone number and Snapchat account, (b) the admission of codefendant Larry D. McClain Jr.'s cell phone location records when the records did not state they were made under oath, (c) improper comments made by the State during closing argument, and (d) various additional items of digital evidence; (2) defense counsel further rendered ineffective assistance by withdrawing a motion to sever the trial from that of his codefendants; (3) the trial court erred by admitting Comcast door logs or, in the alternative, defense counsel rendered ineffective assistance by failing to timely object to the logs; (4) the court erred by allowing a prior consistent statement without a limiting instruction and defense counsel rendered ineffective assistance for failing to request a limiting instruction; and (5) his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const.

- 2 -

1970, art. I, § 11).

¶ 4    For the following reasons, we affirm.

¶ 5                    I. BACKGROUND

¶ 6                    A. Preliminary Matters

¶ 7    As a preliminary matter, we note defendant's jury trial was conducted jointly with the trial of one of his codefendants, Larry D. McClain Jr. This court recently affirmed McClain's conviction and sentence. See *People v. McClain*, 2026 IL App (4th) 250086-U. In his appeal, McClain raised many of the same issues defendant raises here. Thus, this disposition at times cites *McClain* for its precedential value and often includes facts and analysis consistent with *McClain*. However, this court has undertaken an independent review of the appeal and the record as it relates to the issues defendant raises and has also included facts not included in *McClain* in order to fully address the issues.

¶ 8    For clarity, we also note we will refer to Monroe McWard, defendant's trial attorney, as defense counsel or McWard. If it is necessary to refer to McClain's attorney, Mark Wykoff, he will be referred to as Wykoff.

¶ 9                    B. Indictment and Pretrial Motions

¶ 10    In March 2022, a grand jury indicted defendant on nine counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2020)), one count of armed robbery (*id.* § 18-2(a)(1)), one count of armed violence (*id.* § 33A-2), one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1)), and possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)). The counts of unlawful possession of a weapon by a felon and possession of a firearm by a street gang member were later severed from the other charges. The indictment alleged that, on August 9, 2021, defendant, along with codefendants McClain and Joseph Hembrough, while armed, went to the

home of English, located at 2517 South 10th Street in Springfield, Illinois, with the intent of committing a theft and, while inside the home, they shot and killed Williams, English, and Gant and stole money and drugs.

¶ 11　　　　In July 2024, defense counsel filed a motion to sever defendant's trial from the trials of Hembrough and McClain based on the possibility the State might use recorded statements from Hembrough and McClain to implicate defendant in the crimes.

¶ 12　　　　In August 2024, the State filed a motion *in limine* to admit evidence of admissions made to third parties. The State alleged that while Hembrough was incarcerated on an unrelated matter, he told his cellmate, Michael Pullings, about the murders. The motion alleged Hembrough told Pullings that he and two other individuals participated in a drug-related robbery in Springfield, and the other two individuals shot and killed the three victims. Hembrough also told Pullings he left behind a magazine from his gun at the scene.

¶ 13　　　　In August 2024, defense counsel renewed the motion to sever. However, at a September 2024 pretrial hearing, the motion to sever was withdrawn after Hembrough pleaded guilty and agreed to testify against defendant and McClain. Wykoff, who had filed a motion to sever McClain's trial from Hembrough's trial, told the trial court his motion was moot, given that Hembrough had pleaded guilty. Defense counsel then told the court, "Your Honor, I don't think it's an issue anymore on my motion to sever, so show it withdrawn or denied, however you want to do it." Thereafter, defense counsel did not discuss any issues concerning proceeding to a joint trial with McClain as a codefendant. The court reserved ruling on the State's motion *in limine* regarding Pullings's testimony.

¶ 14　　　　　　　　　　　　　　　C. Jury Trial

¶ 15　　　　A joint jury trial of defendant and McClain occurred in September 2024. The

following evidence was adduced at trial.

¶ 16   On August 8, 2021, a party was held at English's home at 2517 South 10th Street. Shyra Daniel, Nashaya Wilson, Michael Smith, Jamika Harris, Jabborah Harris, Davosia Whiteside, Williams, Gant, and McClain attended the party. During police interviews with these individuals, it was revealed McClain was a light-skinned Black male who went by the nicknames "Junior" and "White Boy." There was no evidence defendant was at the party.

¶ 17   1. *Michael Smith*

¶ 18   Smith testified he attended the party. Further, Smith admitted he knew Williams was a drug dealer and was in possession of large sums of money, and there were drugs at English's home. Smith indicated McClain was at the party, but Smith never saw him because Smith was asleep for most of it. Smith recalled telling the police he saw McClain in possession of a Glock 9-millimeter pistol, although he also stated he did not see McClain with a gun at the party.

¶ 19   After the party, some of the attendees went to an IHOP restaurant, but McClain did not go. Smith and Whiteside then went to the apartment of Aaliyah Flakes, where they remained for the rest of the night. When they arrived at Flakes's apartment, Flakes argued with Whiteside and slashed the tires on Whiteside's vehicle. Smith and Whiteside did not leave the apartment until the next day, when the tires were fixed. Flakes's police interview and surveillance video from the area corroborated that Smith and Whiteside were at Flakes's apartment during the time the homicides occurred. Smith learned of the murders when LaQuintae Brewer called and told him the next day.

¶ 20   2. *Davosia Whiteside*

¶ 21   Whiteside's testimony generally corroborated Smith's testimony that they were at Flakes's apartment overnight and until his tires were repaired the next day.

¶ 22                                                3. *Latravian Medley*

¶ 23         Latravian Medley testified he went to 2517 South 10th Street the morning after the party when Williams did not answer his phone. He went in the house and discovered the bodies of Williams and English. Medley testified he was on the phone with Brewer and told Brewer what he saw. Brewer and possibly another person came over to the house, but no one called the police. Surveillance video obtained by the police showed Medley's and Brewer's vehicles in the area of the crime scene the morning after the homicides.

¶ 24         According to Medley, William's vehicle was a Dodge Challenger. (We note that throughout the record, witnesses varied between referring to the vehicle as a Dodge Challenger or a Dodge Charger. For purposes of this disposition, we use the term Challenger throughout to refer to the vehicle regardless of which label the witnesses used.) Medley saw the Challenger at the house, and it did not have any damage or a broken window at that time. Medley asserted he did not take anything from inside the home or the vehicle.

¶ 25                                                4. *Shunderika Price*

¶ 26         Shunderika Price testified she was Williams's fiancée. After she was unable to get in contact with Williams on August 9, 2021, Price went to 2517 South 10th Street. She knocked on the front door, but there was no response. Price walked around to the back door and saw Williams's red Challenger in the backyard with broken windows.

¶ 27         Price entered the home after finding the back door was open. She found English lying on the kitchen floor and Williams on the dining room floor, both with gunshot wounds. Price stated the home was "messed up" and "filthy," which was not normal for the home. After calling 911 to report what she saw, Price walked into one of the bedrooms, where she found Gant up against a wall with a gunshot wound.

¶ 28                    5. *Crime Scene Evidence Testimony*

¶ 29                         a. Brian Crolly

¶ 30        Brian Crolly, a patrol officer with the Springfield Police Department, was the first officer to arrive on the scene. He did not observe any signs of forced entry, and the front door was locked. Crolly saw multiple cartridge casings on the ground next to the bodies. The house was in disarray, with the cabinets in the kitchen left open and items thrown around the house.

¶ 31                         b. Lori White

¶ 32        Lori White, a crime scene detective with the Springfield Police Department, took photographs and collected evidence from the scene. In the back of the house, there were muddy tire tracks and a footwear impression. Williams's vehicle, which was parked in the backyard, had a broken driver's side window. In the kitchen, there were open cabinets and drawers. To the left side of English's body, there was a mop and bucket, a bottle of bleach, and three spent cartridge casings. In the dining room, there was a fully loaded magazine next to Williams's head and spent cartridge casings next to his body. There were no suitable fingerprints for testing on the magazine or the ammunition in the magazine. On the dining room table, there was a digital scale with some white residue, a glass jar with residue of green plant material, and two boxes of sandwich baggies. Later testing determined one fingerprint on the glass jar matched Whiteside and four prints matched McClain.

¶ 33        White recovered 5 spent cartridge casings in the kitchen, 11 spent cartridge casings in the living room and dining room area, 5 spent cartridge casings in the bedroom, and 4 fired bullets. All the cartridge casings were determined to be 9-millimeter Luger casings. Later testing revealed the cartridge casings were fired from two different firearms. Four of the five cartridge casings from the bedroom and eight cartridge casings from the dining room came from one gun,

while the remaining cartridge casings were fired from another gun.

¶ 34         White also collected DNA swabs from numerous surfaces throughout the house. None of the swabs tested contained DNA consistent with McClain or defendant.

¶ 35                              c. Michael Fannin

¶ 36         Michael Fannin, a sergeant with the Springfield Police Department, processed the Challenger located in the rear of the house. A search warrant for the vehicle listed Williams as the registered owner. Latent fingerprints were obtained from the hood of the vehicle and the exterior driver's door handle. Two fingerprints from the door handle were later determined to be from Smith. Fannin testified it appeared someone had rummaged through the vehicle while attempting to steal it. The driver's side window was also broken. A brick was found nearby and was consistent with a red substance seen on the broken window. Fannin collected several DNA swabs from the vehicle and the brick. The DNA swabs from the brick and the prints from the vehicle's door handle were consistent with coming from Smith.

¶ 37                   6. *Comcast Door Logs and Surveillance Video Evidence*

¶ 38                              a. Michael Mack

¶ 39         Michael Mack, a police detective with the Springfield Police Department, testified he obtained a search warrant for the Comcast security system at English's residence to look for surveillance video and door entry logs. Mack did not analyze the information returned by Comcast. However, he identified the return for the warrant and testified the documents fairly and adequately depicted the records returned by Comcast. The State then moved to admit the documents into evidence. McWard stated, "No objection." However, Wykoff told the trial court he was not fully confident the Comcast certificate was in full compliance with the notice requirement of Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018). The State replied it believed the certificate was in

- 8 -

full compliance, and Wykoff withdrew the objection. The Comcast records were then admitted into evidence. Mack then testified about other matters, and the records were not further discussed.

¶ 40 At the conclusion of Mack's testimony, Wykoff requested a sidebar. The sidebar was held off the record, but the trial court later summarized it on the record. The court stated Wykoff argued the Comcast records were not included in the State's notice of intent to use various certifications under Rule 902. Because the witnesses following Mack would not be testifying about Comcast records, the parties agreed to address the issue at a later time.

¶ 41 The next morning, Wykoff objected to the Comcast records. Wykoff stated he told the State before trial that he was going to make sure their disclosures conformed with Rule 902(11), requiring the State to file a notice of intent to use the records as certified records of regularly conducted activity. See *id.* Wykoff told the trial court the State filed the required pretrial notice of intent to use various certifications under the rule, but the notice did not mention any records from Comcast.

¶ 42 In response, the State argued, in part, the objection was untimely when the evidence had already been admitted. The State also contended the defendants obtained notice because the Comcast records and their certificate of authenticity were mentioned in an e-mail between the parties. Defense counsel then stated he was not included in the e-mail about the Comcast records and told the trial court he was joining in Wykoff's objection. The State responded that McWard's objection was even more untimely than Wykoff's because he had not objected at all until that point.

¶ 43 The trial court found the objection untimely as to defendant. The court stated, if defense counsel did not have notice, he should have been surprised by the introduction of the evidence. The court stated, "[W]e can't have a trial where you say, [']I'm objecting to yesterday's

testimony now for the first time because I'm surprised by it because I didn't have notice.['] " The court also found the e-mail to Wykoff provided sufficient notice to McClain.

¶ 44                                        b. Jason Sloman

¶ 45        Jason Sloman, a detective with the Springfield Police Department, identified the door logs obtained from Comcast, and the State sought to publish an exhibit concerning them to the jury. Wykoff stated he objected and had a continuing objection to use of the logs. McWard did not object.

¶ 46        The door logs showed the front door of English's residence was opened at 1:49 p.m. on August 9, 2021, which was consistent with when officers first responded to the scene. Before that, the front door had not been opened since 1:06 a.m. Sloman reviewed surveillance video from the area around English's residence. One video showed a dark red or maroon four-door vehicle with a silver front quarter panel and silver hood in the area around 12:58 am. Another video from a camera across the street from English's residence showed three figures standing on the porch at around 1:05 a.m. At 1:14 a.m., the red vehicle was seen coming out of the alley behind English's residence, and it was later seen coming back toward the residence at around 1:51 a.m. The police did not recover any surveillance video showing the red vehicle leaving the area a second time.

¶ 47        Sloman put out a law enforcement bulletin to locate the red vehicle. Around two months later, Sloman determined the red vehicle was a 2007 Mercury Milan owned by Taylor Rosenberger. Rosenberger had totaled the vehicle in a crash a few days after the homicides, and the vehicle was in the possession of a towing company. The towing company gave the police possession of Rosenberger's vehicle.

¶ 48        According to Sloman, surveillance video showed Smith and Whiteside exiting

IHOP at approximately 11 p.m. and leaving in a silver Jeep. Smith and Whiteside told Sloman they went to Flakes's apartment. When interviewed, Flakes told Sloman they were there. Detective John Larson testified video showed the Jeep arriving at the parking lot of Flakes's apartment. He also testified Flakes told him she was angry and slashed the tires on the Jeep, which was depicted in the video. In an interview, Smith said he received a call about the murders the next morning. The video showed the Jeep remained at the apartment until the tires were fixed.

¶ 49                                    7. *Taylor Rosenberger*

¶ 50            In August 2021, Rosenberger was living with Steven McFadden, Marya Park, and her boyfriend, Hembrough, in a house in Jacksonville, Illinois. She and Hembrough both sold methamphetamine at that time. Rosenberger knew Hembrough was friends with defendant, who also went by the nickname "Fats, like F-A-T-S or Z." She confirmed she owned a red 2007 Mercury Milan with a gray hood in August 2021. Rosenberger stated Hembrough would often drive the vehicle without her permission.

¶ 51            On August 8, 2021, Rosenberger overheard Hembrough talking on the phone to someone about "[h]itting a lick," which she explained was slang for robbing someone. She went to sleep around 7 or 8 p.m. that night. When she woke up on August 9, 2021, at around 7 or 8 a.m., her vehicle was missing, and Hembrough was not home. Hembrough returned later that morning in a black Ford pickup truck with a light-skinned individual she did not recognize. She later learned that person was McClain. McFadden gave McClain a different set of clothes. Hembrough and Rosenberger left in the truck, where Hembrough showed her a large quantity of methamphetamine. McClain left Rosenberger's home around 1 or 2 p.m. Afterward, Rosenberger discovered a large quantity of little individual bags of fentanyl in the home. Rosenberger testified no one in the home used fentanyl, and she did not know Hembrough to sell fentanyl.

¶ 52 Rosenberger confirmed she was in a vehicular collision on August 13, 2021, which resulted in totaling her vehicle. Shortly thereafter, she and Hembrough were in another collision in Schuyler County. Rosenberg testified they both went to jail after methamphetamine was found in a bulletproof vest in the vehicle. Rosenberger believed it was the same methamphetamine Hembrough had shown her in the black pickup truck a few days earlier. Rosenberger bonded out of jail and sold methamphetamine in order to bond Hembrough out of jail. However, Hembrough was later arrested in October 2021 in Morgan County on unrelated charges.

¶ 53 On cross-examination by defense counsel, Rosenberger stated Hembrough told her he left behind a "clip" to his gun at the scene of the homicides. She also testified there was a time Hembrough took off her shoes and burned them and made her strip off her clothes and burn them.

¶ 54                                  8. *Steven McFadden*

¶ 55 McFadden testified that, after he learned of who was charged in connection with the murders, "[t]he light-skinned male" looked like a person he had met at Hembrough's house on one occasion, but he did not recall giving that person any clothing. McFadden acknowledged there was a burn pit in Hembrough's yard, and he remembered the police asking him about it and suggesting they knew he was there when Hembrough burned items of evidence. McFadden testified he told the police the only clothes burning he was aware of was when he "burned my baby mama's stuff" and when Hembrough burned Rosenberger's clothes on two different occasions.

¶ 56                                  9. *Joseph Hembrough*

¶ 57 Hembrough testified he was currently incarcerated in the Sangamon County jail. Hembrough had known defendant for approximately a year, and defendant went by the nickname "Fats." He agreed that would "be like F-A-T-S or F-AT-Z." Hembrough stated he saved defendant's phone number in his contacts as "My favorite fat boy."

¶ 58        On August 8, 2021, defendant texted Hembrough that he was looking for a new connection for drugs. Defendant went to Hembrough's home and showed him a Snapchat video of an individual with a red vehicle and large amounts of money. Hembrough did not recognize the individual but later learned it was Williams. He initially thought they would purchase drugs from Williams, but defendant indicated they might get the drugs for free. Hembrough testified he understood this to mean they would commit a robbery.

¶ 59        Later that night, defendant messaged Hembrough it was time to meet up. Hembrough, while armed with a Ruger 9-millimeter pistol and wearing a bulletproof vest, drove Rosenberger's vehicle to defendant's house in Jacksonville. A picture of a Ruger pistol and three magazines taken from Hembrough's cell phone was entered into evidence.

¶ 60        After picking up defendant, they drove to an apartment complex in Springfield and picked up McClain, who defendant introduced to Hembrough as "Junior." Hembrough did not know McClain. Defendant and McClain directed Hembrough to drive to an address on South 10th Street, and they did not discuss anything on the way. Around 1 a.m., they drove past the back of the house, circled the block, and then parked the vehicle in the back alley of the house.

¶ 61        The group exited the vehicle and walked around to the front porch. McClain knocked on the door, and English opened the door and let them in. Hembrough entered the dining room, while English went to the kitchen to retrieve a scale and a bag. Williams entered the room and started yelling at McClain for bringing people over to the house unannounced. McClain put his head down and apologized to Williams. However, defendant responded by pointing a Glock 34 pistol, equipped with a switch to make it into a fully-automatic weapon, at Williams. Williams laughed and moved to smack the gun out of defendant's hand, and the gun went off. Williams was shot multiple times in his left side and collapsed in the dining room. Hembrough then saw McClain

turn and shoot English two to three times in the kitchen. McClain took keys and money from Williams's pockets, and then defendant and McClain went toward the bedroom at the front of the house. Hembrough stated he was in complete shock and started pacing before he heard another round of automatic gunfire. He ran to the front bedroom and saw McClain fire a single shot at a person who was cowering in the corner of the room.

¶ 62        All three then ran out the back door to Rosenberger's vehicle. Hembrough noticed a magazine on the ground next to Williams and later realized the magazine came from his firearm. Later testing determined the live rounds in the magazine did not match any of the spent cartridge casings recovered at the scene. Hembrough asserted he never pulled out his firearm, but it was possible he accidentally bumped the release during the incident. Hembrough testified they were in the house for around 5 to 10 minutes at most. As the group was leaving, they tried to open the Challenger with the keys defendant took from Williams, with the intent to steal money they believed was in the trunk. However, they were unable to unlock the vehicle. It had no broken windows at that time. The group got back into Rosenberger's vehicle, and defendant and McClain realized no one had grabbed the drugs. McClain ran back into the house through the back door and returned with a large gray bag containing drugs.

¶ 63        The group pulled out of the alley and began to drive toward Jacksonville when defendant realized he did not have his phone. Defendant used Hembrough's cell phone to call his phone to see if he could hear it in the vehicle. Defendant then called his girlfriend using Hembrough's phone and asked her to ping the location of the phone. She did so and sent a screen shot of the phone's location, which was back at the crime scene. They were near New Berlin, Illinois, at the time, and they turned around and went back to the house. Hembrough testified defendant found his phone in the back alley.

¶ 64        The group then drove back to Hembrough's house and split the drugs from the gray bag, which consisted of approximately five pounds of methamphetamine and nine ounces of fentanyl. After splitting up the drugs, McClain and Hembrough burned their clothes in a burn pile at the house. McFadden gave McClain a pair of pants and a shirt. Hembrough gave defendant a ride back to his house, and McClain remained at Hembrough's home. When Hembrough left, McFadden and McClain were playing video games in the front room. After dropping off defendant, Hembrough made several stops before returning to his house. He picked up Rosenberger and later showed her the methamphetamine. He also took Rosenberger to buy some items because he had recently been in an argument with her and burned her clothes. In the afternoon, Hembrough gave McClain a ride back home. Hembrough testified he later sold his Ruger pistol to McClain. The firearms used in the murders were never recovered by the police.

¶ 65        A few days later, Hembrough and Rosenberger were in a vehicular collision in Schuyler County that resulted in the vehicle being totaled. Hembrough and Rosenberger were arrested after the police discovered methamphetamine in the vehicle. Hembrough stated this was the same methamphetamine he obtained during the robbery. Hembrough testified he was not honest with the officers who arrested him.

¶ 66        On October 18, 2021, Hembrough was arrested for unlawful possession of a firearm by a felon and possession of stolen property in Morgan County after officers executed a search warrant at his house in a different case and found a Polymer 80 pistol and an SKS rifle. Later testing determined none of the cartridge casings recovered from the crime scene matched the pistol.

¶ 67        On October 22, 2021, Hembrough approached the police at the Morgan County jail to provide information regarding the triple homicide at 2517 South 10th Street. In March 2022, Hembrough was charged with three counts of first degree murder.

¶ 68 On cross-examination, Hembrough stated he pleaded guilty to lesser charges in the Schuyler County case, and the Morgan County case was dismissed. He was interviewed by the police twice in October 2021 and again in February 2022. Hembrough asserted he was completely truthful in his February 2022 interview. However, he admitted he lied to the police about not being present for the murders during his first two interviews in October 2021.

¶ 69 Hembrough agreed he approached law enforcement about telling his version of the story to try to get out of jail or not spend his life in jail. However, instead of admitting his own involvement with the murders, he told police defendant and McClain showed up at his house with two kilos of methamphetamine. Additionally, Hembrough admitted he lied about not knowing what vehicle was used and about letting defendant use his cell phone. Hembrough told the police at that time that he was not involved with the murders whatsoever. Further, Hembrough acknowledged he told the police at his first interview, "I'm trying to do everything I can to save my own bacon." In the February 2022 interview, Hembrough finally admitted to the police he had been present during the murders.

¶ 70 On cross-examination, defense counsel questioned Hembrough's motivation in pleading guilty two weeks before the trial and agreeing to testify against defendant in exchange for a 20-year sentence. Additionally, defense counsel attacked the inconsistencies between Hembrough's statement to police in February 2022 and his trial testimony. Specifically, defense counsel asked Hembrough,

> "And here it is two weeks before trial, on September 6 of 2024, just about three years later, it's at this point, despite all these other lies you told to police officers that now you want to come forward, make a deal with the State, and now you're being candid about this, right?"

Hembrough responded his statement on September 6, 2024, was the same as his statement made in February 2022.

¶ 71    Similarly, Wykoff questioned Hembrough about his previous assertions he was not guilty and his motivation to plead guilty shortly before trial. Hembrough stated he had recently learned he was guilty on a theory of accountability. Before that, he still believed he could be found not guilty because he was not one of the actual shooters. Wykoff also accused Hembrough of repeatedly lying, including lying during his police interviews and to the jury at trial. Hembrough acknowledged lying in his October 2021 interview but denied lying during his trial testimony. Wykoff then asked, "[Y]ou're a liar, right?" Hembrough responded, "No."

¶ 72    On redirect examination, the State asked, "In order to get 20 years for first-degree murder, was there something you were required to do?" Hembrough responded, "To give an honest and truthful statement." The State followed up, "And if you are not honest and truthful, what happens to this 20 years?" Hembrough replied, "They revoke the plea, and I face the full sentence of the charges."

¶ 73    10. *Michael Pullings*

¶ 74    Following Hembrough's testimony, the State sought to admit Pullings's testimony as a prior consistent statement by Hembrough to rebut an accusation of recent fabrication or a motive to testify falsely. Specifically, the State sought to admit Pullings's testimony to show the plea deal did not influence Hembrough's testimony. Both defense counsel and Wykoff objected; however, the trial court allowed the testimony. Neither counsel requested a limiting instruction for the jury.

¶ 75    Pullings testified that, in October 2021, he was in custody at the Morgan County jail due to pending burglary and drug charges. His cellmate was Hembrough, who he had known

since he was a child. Hembrough told Pullings he was involved in a triple homicide on 10th Street. Hembrough told Pullings "Fats and the white dude" from Springfield were also involved, and the group meant to commit a robbery at the house. Pullings identified defendant in court as "Fats." Hembrough disclosed to Pullings he drove the group to the house on 10th Street. After the group went inside, a man with gold teeth came out of a bedroom and asked why they were there. "Fats" shot the individual with the gold teeth with an automatic weapon. The group took methamphetamine and fentanyl from the house. Hembrough explained to Pullings they tried to unlock the Challenger to steal money but were unsuccessful. The group left and returned to Hembrough's house. Hembrough divulged to Pullings that he flushed the fentanyl because he could not sell it for the price he wanted. He also told Pullings he accidentally left a magazine from his gun at the scene. Pullings also testified he heard Hembrough and "Fats" yelling back and forth about the homicides at the jail.

¶ 76        On cross-examination, Pullings admitted he told the police he thought Hembrough might be lying, and Hembrough threatened to kill him if he told anyone. Pullings stated Hembrough never told him the name of the third perpetrator. When Hembrough told him the third person was a "white guy," Pullings understood this to mean the third perpetrator was a white person.

¶ 77                              11. *Tyann Miller*

¶ 78        Tyann Miller was dating McClain in August 2021. In December 2021, McClain made statements to her about a robbery he was involved in. Miller recalled McClain was distraught and crying, and she heard him say "[W]hy would you let me do this," and, "I shouldn't have did what I did." Miller was asked if she recalled telling detectives McClain had said that, during the course of the robbery, " 'things went left.' " Miller responded, "That's not how he described it, but

that is what I said." Miller testified McClain did not give her any details about the robbery and did not tell her what he did or who he was with.

¶ 79                                    12. *Garrett Harney*

¶ 80            Prior to Garrett Harney's testimony, the State moved to admit records consisting of cell tower data and certifications of authenticity from AT&T and T-Mobile. Defense counsel stated, "No objection subject to cross and no objection to publish." Wykoff stated, "Identical. Thank you, Your Honor." The certification of authenticity from T-Mobile for McClain's records did not state the record was made under oath. However, the certification of authenticity for defendant's AT&T records did state it was made under oath.

¶ 81            Harney had been employed by the Sangamon County Sheriff's Office for the past 12 years and was currently a detective. He specialized in digital forensics, which he described as a special branch of forensics dealing with the analysis, examination, and extraction of digital devices such as cell phones, computers, and cell data records. He received training at the National Computer Forensics Institute and completed multiple specialized trainings with CellHawk, which is a software that can overlay cell data records on a Google map. He had performed over 420 cell phone extractions and completed cell data mapping in over 115 cases. Harney's curriculum vitae noted he obtained a CellHawk user certification.

¶ 82            Harney testified that, in October 2021, the Springfield Police Department contacted him to assist in mapping the cell data records in the case. The State moved to admit State's exhibit Nos. 98 and 98A, consisting of McClain's cell phone location data and a T-Mobile certification of authenticity. Defense counsel stated, "No objection at this point, subject to cross-examination." Wykoff stated, "Same. Thank you, Your Honor." The State also admitted without objection Hembrough's and defendant's cell phone location data.

¶ 83    Harney stated the cell site location data was obtained through individual device extractions and search warrants sent to AT&T, Verizon, and T-Mobile. He also used cell tower data obtained from the phone carrier companies. Harney used the phone numbers associated with defendant's, McClain's, and Hembrough's cell phones to narrow down the location data from the cell tower dumps for each device. Harney uploaded the cell site location data from the three devices and the cell tower dump data into CellHawk to generate a screen recording depicting the movement of the devices on a map. The State admitted without objection the CellHawk screen recording and several screenshots taken from the recording. The recording was played for the jury.

¶ 84    Harney testified the CellHawk mapping of the three devices showed that, on August 9, 2021, at around 12:42 a.m., all three devices were pinging off the same tower in Springfield near the crime scene. Around 1:24 a.m., Hembrough's device was pinging a tower west of Springfield, while defendant's device remained in the same area near the crime scene. Around 2 a.m., all three devices were moving away from the crime scene, and by 2:20 a.m., all three devices were pinging off towers in Jacksonville.

¶ 85    On cross-examination, Harney stated Detective Ryan Maddox told him the AT&T number associated with defendant. Harney testified that, based on the records, defendant was not a subscriber with AT&T.

¶ 86                             13. *Ryan Maddox*

¶ 87    Before Detective Maddox testified, the State offered a limiting instruction regarding defendant's and McClain's jailhouse calls. Defense counsel stated, "Your Honor, I understand what they are doing and I have no objection." Wykoff added, "I welcome the instruction, Your Honor."

¶ 88    Maddox was the lead detective in the case. During an August 2021 police interview,

Smith told Maddox he saw McClain in possession of a Glock 19 pistol at the party on August 8, 2021.

¶ 89          The State admitted without objection the phone records from defendant's, Hembrough's, and McClain's cell phones. Maddox extracted information from Hembrough's phone. Regarding defendant's phone number, Maddox testified Hembrough told him the phone number saved as "My Favorite Fat Boy" belonged to defendant. The phone number for that contact was changed on August 16, 2021, to a different number. Maddox also obtained call logs from AT&T for Hembrough's phone numbers. Maddox identified a number ending in 8820 as a number associated with the "My Favorite Fat Boy" contact on Hembrough's phone at the time of the murders.

¶ 90          Maddox testified he used the extracted phone number to obtain a Snapchat profile, which corroborated that the phone number belonged to defendant. That profile had a username of "ebk_kell" and an e-mail address of itsjohnwick@icloud.com. The display name was "EMGFATZ" followed by emoji characters. The account was created in September 2015 using the phone number ending in 8820.

¶ 91          The call logs showed calls were placed from Hembrough's phone to defendant's phone at 1:23 a.m. and 1:27 a.m. on August 9, 2021. The logs also showed a call was made from McClain's phone to Hembrough's phone at 3:30 a.m. on August 9, 2021. The logs for defendant's phone showed his device received calls from McClain's device at 9:23 p.m. and 11:11 p.m. on August 8, 2021. The logs also showed defendant's phone made an outgoing call to McClain's phone at 12:46 a.m. on August 9, 2021.

¶ 92          Maddox testified regarding the CellHawk screen recording that was created using the cell site location data from the devices of defendant, Hembrough, and McClain. He was not

tendered as an expert witness, and his testimony was generally consistent with Harney's testimony about the CellHawk screen recording.

¶ 93        The trial court admitted, without objection, exhibit Nos. 101 and 102, consisting of recordings from defendant's and McClain's jailhouse calls. Immediately after, the court instructed the jury, "With regards to People's Exhibits Number 101 and 102, if you determine a defendant made a statement you should consider that statement as evidence only against the defendant who made the statement." Five recordings of defendant's calls were played for the jury.

¶ 94        In the first recording, defendant can be heard referring to "white boy" or "island boy," and insisting that person needed to "take his weight." Maddox testified that, through the investigation, he found people referred to McClain using those names. Maddox stated that taking one's weight meant "the person that's being spoken of needs to take their accountability for something that occurred." Defendant also referenced "three bodies."

¶ 95        In another jailhouse call made before McClain's arrest, defendant said, "Junior [needs to] come take his motherfuckin' charge." Maddox testified this phrase also meant the person being referred to needed to take responsibility for something that occurred.

¶ 96        In a jailhouse call placed on March 2, 2022, the day of McClain's arrest, defendant said, "You know they caught island boy?" Maddox testified defendant was not told there were any other suspects in the case. Jailhouse calls made by McClain were also played for the jury.

¶ 97                          14. *Closing Argument and Jury Verdict*

¶ 98        In closing arguments, defense counsel argued, "You know as well as I do Hembrough's concocting this story so he can get what he wants. He's then peddling that going on three years now. And finally they accepted it. He's succeeded. He saved his bacon." Defense counsel argued Hembrough lied in each of his police interviews and declared, "He's a liar then.

- 22 -

He's a liar now." He further told the jury,

"But whatever he's doing and whatever he's saying, there's no question that he started out the whole process back in October of 2021 by saying one thing, the one thing you can believe him on. I'm trying to save his bacon. I'm trying to save my bacon. And it didn't work in 2021[,] '22, '23, but now, two weeks before trial, it's working. He saved his bacon. He's still a liar."

¶ 99       In McClain's closing argument, Wykoff reiterated that Hembrough told numerous lies during his police interviews. Wykoff also stressed Hembrough's lack of credibility in closing, arguing, "Hembrough's 100 percent truth is our 100 percent bull crap."

¶ 100      In rebuttal, the State argued Hembrough was a witness because he accepted responsibility. The State also argued,

"[Hembrough] took 20 years of his life away.

He accepted that and so if 20 years of your life is gone is a deal, but there was a catch. Not only would he lose 20 years of his life, he had to tell the truth. And if he didn't, that 20 years, it's gone and he's looking at a potential life sentence. And not his version of the truth. Not even what the prosecutors want to hear. The truth. The judge decides that. And so [Hembrough] is not thinking to himself, what can I get away with? He is motivated to be truthful now."

¶ 101      The State then addressed Pulling's testimony, stating the defense was arguing Hembrough lied in his testimony in order to get a deal, but Hembrough told Pullings exactly what happened before there was any deal. The State then said,

"All of those points, he told his buddy, Michael Pullings, before there was ever any deal. All of that was said before. And you are allowed to use that to conclude, yes,

telling Michael Pullings what happened just as he told you.

No one is asking you to trust Joe Hembrough. No one's asking that of you. That is why you spent the better part of, I don't know, 40 minutes seeing all the places in his story that are corroborated by other evidence. You do not have to trust Joe Hembrough. You trust the corroboration. That corroboration is almost entirely neutral and objective and includes phone records and GPS data and photographs and surveillance video. So don't focus on what Joe said before. Focus on what he did say. Because what he said was completely corroborated by the evidence. And while you're thinking about what Joe said, take into account what all the other witnesses said as well. Because all the other witnesses, not just Joe Hembrough, support the defendants' guilt."

¶ 102    Prior to deliberations, the trial court gave the jury the following instruction:

"Only you are the judges of the believability of the witnesses and of the weight to given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011).

¶ 103    The jury found defendant guilty of the first degree murders of Williams, English, and Gant, armed robbery, and armed violence.

¶ 104                    D. Posttrial Motions and Sentencing

¶ 105    Defendant filed motions for a new trial, arguing, in part, that (1) the State

improperly bolstered the credibility of Hembrough in its closing argument by inferring the State would revoke his plea agreement and vacate the guilty plea if Hembrough did not testify truthfully, (2) the trial court erred by allowing Pullings to testify about an alleged prior consistent statement by Hembrough, (3) the court erred by allowing admission of the Comcast door logs into evidence, (4) despite a lack of objection from defense counsel, the court erred in allowing evidence of defendant's phone number and Snapchat account because the State filed to properly authenticate them, and (5) the court erred by allowing prejudicial evidence from McClain's prosecution to influence the jury, notwithstanding defendant's withdrawal of the motion to sever the trials.

¶ 106 In December 2024, the presentence investigation report (PSI) was filed in the trial court. The PSI showed defendant was 20 years old at the time of the crimes. Defendant was raised by his mother and did not know the identity of his father. Defendant did not have any known juvenile adjudications but had a history of several drug offenses as an adult. Defendant had some employment history. Defendant reported completing his junior year of high school and then joining the job corps to complete his diploma. However, the high school had no record of him. The job corps reported defendant had been expelled due to a disciplinary action for violence. Defendant reported being in good mental and physical health. He reported using cannabis daily from 2019 through 2021.

¶ 107 On December 9, 2024, the trial court held a hearing and denied defendant's motion for a new trial. The court then proceeded to the sentencing hearing. Neither defense counsel nor Wykoff presented any evidence in mitigation. Defendant declined to present a statement in allocution, stating he was innocent.

¶ 108 The State requested a mandatory life sentence under section 5-8-1(a)(1), (c)(ii) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-1(a)(1), (c)(ii) (West 2024)).

Defense counsel did not address defendant's possible status as an emerging adult in argument. However, Wykoff briefly argued the matter regarding McClain, stating the trial court was required to impose a sentence that conformed with the proportionate penalties clause of the Illinois Constitution. Wykoff argued McClain was an emerging adult at the time of the crimes, and any sentence greater than 40 years would be an improper *de facto* life sentence.

¶ 109       The trial court stated it considered the trial evidence, the PSI, the victim impact statements, the history, character, and attitude of defendant, the evidence and arguments presented, and the statutory factors in aggravation and mitigation. As to the first degree murder convictions, the court stated, "as required by statute, life in prison." The court further sentenced defendant to a concurrent 30-year sentence for the armed violence conviction. The armed robbery conviction merged into the first degree murder convictions.

¶ 110       Defendant filed a motion to reconsider his sentence. He argued his mandatory life sentence violated the proportionate penalties clause of the Illinois Constitution because the trial court had no discretion to consider any mitigating factors relating to his individual characteristics as a young adult offender. Defendant noted his father was never in his life and asserted he started consuming alcohol at the age of 12 or 13 and used cannabis daily. He stated he "was bounced back and forth" between Mississippi and Illinois and had witnessed a friend's murder when he was 14 years of age. Defendant stated his education was interrupted at age 13, and he did not complete a GED. Defendant referred to himself as "an addicted person" and "devoid of formal education and fatherly guidance," which "rendered him more susceptible to peer pressure and more volatile in emotionally charged settings."

¶ 111       In January 2025, the trial court held a hearing and denied the motion, finding the statute required it to impose a mandatory life sentence.

¶ 112          This appeal followed.

¶ 113                                    II. ANALYSIS

¶ 114          On appeal, defendant argues (1) he was denied effective assistance of counsel when defense counsel failed to object to (a) the admission of evidence of defendant's cell phone number and Snapchat account, (b) the admission of McClain's cell phone location records when the records did not state they were made under oath, (c) improper comments made by the State during closing argument, and (d) the foundation for his AT&T cell phone records and evidence concerning the use of CellHawk software; (2) defense counsel further rendered ineffective assistance by withdrawing a motion to sever the trial from that of his codefendants; (3) the trial court erred by allowing admission of Comcast door logs or, in the alternative, defense counsel rendered ineffective assistance by failing to timely object to the logs; (4) the court erred by admitting a prior consistent statement without a limiting instruction, and counsel rendered ineffective assistance for failing to request a limiting instruction; and (5) his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 115                         A. Ineffective Assistance of Counsel

¶ 116          Defendant argues defense counsel was ineffective for failing to object to (1) the admission of evidence of defendant's cell phone number and Snapchat account, (2) the admission of codefendant McClain's cell phone location records when the records did not state they were made under oath, (3) improper comments made by the State during closing argument, and (4) other items of digital evidence. He also argues defense counsel further rendered ineffective assistance by withdrawing a motion to sever the trial from that of his codefendants.

¶ 117          Claims of ineffective assistance of counsel are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). See *People v. Albanese*, 104 Ill. 2d

504, 526 (1984) (adopting the *Strickland* standard). To prevail on a claim of ineffective assistance, a defendant must show counsel performed deficiently and the deficient performance prejudiced the defendant. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 76. To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Hodges*, 234 Ill. 2d 1, 17 (2009) (quoting *Strickland*, 466 U.S. at 687-88). To establish prejudice, the defendant must show, "absent counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Gilker*, 2023 IL App (4th) 220914, ¶ 77. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 118                    1. *Phone Number and Snapchat Profile*

¶ 119        Defendant first contends defense counsel rendered ineffective assistance by failing to object to lack of foundation for defendant's phone number and the Snapchat profile used to corroborate that the phone number belonged to defendant.

¶ 120        We analyze electronic messages or data obtained from a phone like any other form of documentary evidence. See *People v. Watts*, 2022 IL App (4th) 210590, ¶ 71 (citing *People v. Price*, 2021 IL App (4th) 190043, ¶ 115; *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51). Thus, we apply the following propositions of law pertaining to items such as documents to the authentication of data such as a cell phone number or social media profile.

¶ 121        A proper foundation is laid for the admission of documentary evidence if it has

been identified and authenticated. *Id.* ¶ 75. "Authentication of documentary evidence requires the proponent to present evidence the document is what the proponent claims it to be." *Id.* "To do so, '[t]he proponent need prove only a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged.' " *Id.* (quoting *Ziemba*, 2018 IL App (2d) 170048, ¶ 51).

¶ 122　　　　"Documentary evidence may be authenticated by either direct or circumstantial evidence." *Id.* ¶ 76. Circumstantial evidence of authenticity includes factors such as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances. *Id.* Thus, documentary evidence may be authenticated by its contents if it is shown to contain information that would be known only by a small group of people, including the alleged author. *Id.* As with any piece of evidence whose authenticity is questioned, the type and quantum of evidence necessary to authenticate it will always depend on context. *Id.* ¶ 80. See *People v. Brand*, 2021 IL 125945, ¶ 44.

¶ 123　　　　"[T]he bar for authentication of evidence is not particularly high." (Internal quotation marks omitted.) *Watts*, 2022 IL App (4th) 210590, ¶ 82 (quoting *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014)). The proponent need not rule out all possibilities inconsistent with authenticity and needs only to adduce sufficient proof so a reasonable juror could find in favor of authenticity. *Id.*

¶ 124　　　　Once an item of evidence is " 'authenticated' " this merely renders the evidence admissible, leaving the issue of its ultimate reliability to the jury. *Id.* The opposing party then remains free to challenge the reliability of the evidence, minimize its importance, or argue alternative interpretations of its meaning. *Id.* Those challenges go to the weight of the evidence rather than its initial admissibility. *Id.*

¶ 125     We review a trial court's decision to admit documentary evidence for an abuse of discretion. *Id.* ¶ 76. A court abuses its discretion where its decision "was arbitrary, fanciful, or unreasonable," or where "no reasonable person would agree with it." *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 16.

¶ 126     Here, the State presented direct testimony from Hembrough that defendant's phone number was saved in Hembrough's phone under the contact "My favorite fat boy." Additionally, Hembrough certainly had sufficient personal knowledge to testify as to how he saved defendant's phone number as a contact. See *People v. Cadengo*, 2025 IL App (4th) 240568, ¶ 45. Hembrough also told Maddox that same contact name for defendant's phone number. That direct testimony provided sufficient proof where a reasonable juror could find in favor of authenticity. Further, Hembrough's attribution of the number to defendant was corroborated by the Snapchat profile assigned to that number with a display name containing the word "FATZ" and a username containing "kell," which is a variation of defendant's first name. That Hembrough may have lacked credibility as a witness, or that the Snapchat profile did not exactly match defendant's name, were relevant to the weight of the evidence, which was a matter for the jury to decide.

¶ 127     Defendant relies substantially on two cases to argue neither the phone number nor the Snapchat profile were properly authenticated, *People v. Kent*, 2017 IL App (2d) 140917, and *People v. Watkins*, 2015 IL App (3d) 120882. However, those cases are distinguishable.

¶ 128     In *Kent*, the defendant was convicted of the first degree murder of a victim who had been shot in his own driveway. *Kent*, 2017 IL App (2d) 140917, ¶¶ 3-4. On appeal, the defendant argued the trial court abused its discretion in admitting into evidence a Facebook profile under a nickname associated with the defendant entitled " 'Lorenzo Luckii Santos' " that contained a photograph of a person resembling him. *Id.* ¶ 57. The profile contained a post reading, " '[I]ts my

- 30 -

way or the highway..... leave em dead n his driveway.' " *Id.* Notably, the State introduced no direct or circumstantial proof of authentication, defendant did not admit creating the Facebook profile or authoring the post, and there was no testimony suggesting defendant was affiliated with the creation of either. *Id.* ¶ 103. Considering the ease of fabricating a social media account, the *Kent* court found the Facebook post was improperly admitted because the only evidence of authentication was the defendant's nickname and a photograph allegedly resembling the defendant. *Id.* ¶ 119.

¶ 129 In *Watkins*, the appellate court determined the State failed to lay a proper foundation for the admission of photographs depicting text messages in a case where the defendant was charged with unlawful possession of a controlled substance with intent to deliver. After executing a search warrant inside a home where the defendant and five other people were present, the officers found drugs and multiple cell phones in an open kitchen drawer. *Watkins*, 2015 IL App (3d) 120882, ¶¶ 11-12. One of those phones contained drug-related text messages that were directed to someone named "Charles," which happened to be the defendant's first name. *Id.* ¶¶ 16-17. However, there was no evidence of the phone number associated with the phone, and there was no indication from the phone itself that the defendant was the owner. *Id.* ¶ 24. Under those circumstances, the court determined the evidence was insufficient to authenticate the text messages as having been sent to the defendant. *Id.* ¶ 38. In so holding, the court emphasized the police officer who identified the photographs of the text messages at trial "had no personal knowledge of the text messages and had no idea who was the owner or user of the cell phone." *Id.*

¶ 130 *Watkins* and *Kent* are distinguishable from the case *sub judice*. Here, unlike *Watkins*, where there was no evidence of the phone number associated with the phone, and there was no indication from the phone itself that the defendant was the owner, Hembrough's testimony

- 31 -

specifically tied defendant to the phone number. For this reason alone, *Watkins* is easily distinguishable. Then, unlike in *Kent*, where the State presented no evidence of authentication aside from the defendant's nickname and a photograph allegedly resembling the defendant, the State here provided additional evidence. Hembrough testified the phone number belonged to defendant, and that number was then associated with the Snapchat account. Thus, unlike in *Kent*, where the mere use of the same nickname of the defendant was insufficient, here, Hembrough's testimony provided an additional connection by attributing the phone number to defendant. See *People v. Curry*, 2020 IL App (2d) 180148, ¶¶ 54-58 (noting it is proper for a court to consider a wide range of extrinsic evidence to authenticate social media messages and distinguishing *Kent* when there was circumstantial evidence the defendant authored Facebook messages).

¶ 131        Further, we note the Snapchat profile was used to corroborate Hembrough's testimony connecting the phone number to defendant. It was not otherwise used as substantive evidence. All that was required of the State was "to present evidence that the [evidence] is what the proponent claims it to be." (Internal quotation marks omitted.) *Watts*, 2022 IL App (4th) 210590, ¶ 81. Within the context of this case, the purpose of seeking to admit the Snapchat profile was to provide additional evidence the phone number belonged to defendant. Given we find Hembrough's attribution of the phone number to defendant was sufficient, even if we were to find the authentication of the Snapchat account insufficient, defendant would be unable to show prejudice because the phone number was sufficiently authenticated though Hembrough's testimony alone.

¶ 132        2. *McClain's Cell Phone Location Records*

¶ 133        Defendant next contends defense counsel rendered ineffective assistance of counsel by failing to object to the admission of McClain's T-Mobile cell phone location records when the

certifications of authenticity accompanying the records did not state they were made under oath, as required by Illinois Rule of Evidence 902(11) (eff. Sept. 8, 2018).

¶ 134 Rule 902(11) allows for authentication of a record of regularly conducted activity if the record is accompanied by a written certification of its custodian or other qualified person asserting certain required information about the record. *Id.* The word "certification," as used in the rule, "means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury." *Id.* In *People v. Fox*, 2022 Il App (4th) 210262, ¶¶ 81-82, this court clearly held that such certifications must state they were made under oath.

¶ 135 Here, the T-Mobile certificates of authenticity did not state they were made under oath. However, we find defendant cannot show prejudice from defense counsel's failure to object to them.

¶ 136 Assuming, *arguendo*, the failure to object to the certificates was deficient performance, defendant has not met his burden to show there was a reasonable probability that, had defense counsel objected, the outcome of the trial would have been different. Defendant makes no argument the records were not authentic. There is nothing in the record to suggest the State would not have been able to lay the proper foundation, either by obtaining new certificates or calling a witness who could authenticate the records. See *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 64. Defendant has the burden to show a reasonable probability the records would not have been admitted. Thus, under such circumstances, defendant has failed to show prejudice. See *People v. Colone*, 2024 IL App (1st) 230520, ¶ 113 (noting if the defendant had raised a challenge to a recording at trial, the State could have presented an alternative foundation for the recording and citing cases); *McClain*, 2026 IL App (4th) 250086-U, ¶ 108 (holding similarly).

¶ 137 Further, defendant's argument focuses on McClain's cell phone records. Defendant

makes no meaningful argument his own cell phone records were improperly authenticated. We note the certificates of authenticity for defendant's records stated they were made under oath. Those records placed defendant at the scene of the crimes, and McClain's records were merely cumulative evidence supporting Hembrough's account of the crimes. As such, even if McClain's records were not properly admitted, defendant would be unable to show prejudice since his own location records also supported Hembrough's testimony. Accordingly, defendant has failed to show ineffective assistance of counsel.

¶ 138                                    3. *AT&T Records and CellHawk Software*

¶ 139        Defendant also asserts defense counsel rendered ineffective assistance for failing to object to (1) the foundation for the AT&T records attributed to defendant's phone and (2) the use of CellHawk software. However, defendant merely asserts ineffective assistance, without citing any legal authorities or providing any meaningful argument regarding those issues. Thus, defendant forfeited the issues by failing to sufficiently address them on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). The failure to assert a well-reasoned argument supported by legal authority is a violation of Rule 341(h)(7), resulting in forfeiture. See *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009).

¶ 140                                            4. *Motion to Sever*

¶ 141        Defendant contends defense counsel rendered ineffective assistance by withdrawing his motion to sever the trial from codefendants McClain and Hembrough. He argues the failure to sever the trial resulted in the admission of McClain's comments to Miller about a robbery that " 'went left,' " in violation of his right of confrontation guaranteed by the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VI, XIV), when

McClain did not testify and was therefore not subject to cross-examination. Defendant noted a limiting instruction was given regarding statements McClain made in jailhouse calls, but no limiting instruction was given regarding his statements to Miller. On appeal, defendant does not argue statements McClain made in the jailhouse calls prejudiced him.

¶ 142        "As a general rule defendants who are jointly indicted are to be tried jointly unless a separate trial is necessary to avoid prejudice to one of the defendants." *People v. Olinger*, 112 Ill. 2d 324, 345 (1986). One basis for severance arises when the State attempts to utilize statements of one codefendant which implicate the other defendant, resulting in a problem implicating the defendant's right of confrontation. See *id.* (citing *Bruton v. United States*, 391 U.S. 123, 134 n.10 (1968); *People v. Bean*, 109 Ill. 2d 80, 93 (1985)).

¶ 143        We need not address whether such a confrontation problem arose here because defendant cannot establish the prejudice prong of the *Strickland* test. Even if counsel erred in withdrawing his motion to sever the trials, the result of the proceeding would not have been different.

¶ 144        First, McClain's statements to Miller did not directly implicate defendant. McClain only implicated himself. Then, Hembrough clearly identified defendant as his accomplice in the robbery and as one of the shooters. Hembrough's testimony about their locations and travels on the night of the murders was largely corroborated by numerous surveillance videos and cell location data. The cell location data extracted from defendant's, Hembrough's, and McClain's cell phones, in addition to the cell tower data, also largely aligned with Hembrough's trial testimony and the surveillance videos. Additionally, the call logs from defendant's, Hembrough's, and McClain's phones showed the three individuals were in communication with each other around the time of the murders. The police also used surveillance video to rule out other potential suspects.

See *McClain*, 2026 IL App (4th) 250086-U, ¶ 95.

¶ 145    None of the weapons utilized to commit the murders were ever recovered. However, ballistics testing of the spent cartridge casings revealed two firearms were used at the scene. It was also revealed that the unfired cartridges from the magazine found next to Williams, which Hembrough admitted belonged to him, did not match any of the spent cartridge casings. This evidence indicated Hembrough carried a third firearm, which was not fired during the commission of the murders. See *id.* ¶ 97.

¶ 146    Defendant also made statements in jailhouse calls incriminating himself.

¶ 147    Given that McClain's statements did not directly implicate defendant and there was strong evidence linking defendant to the crimes, there is no reasonable probability that, but for the admission of McClain's statements, the jury would have acquitted defendant. Because defendant cannot show he was prejudiced by McClain's statements, he has failed to show ineffective assistance of counsel based on defense counsel's withdrawal of the motion to sever.

¶ 148    5. *Closing Argument*

¶ 149    Defendant next argues defense counsel rendered ineffective assistance of counsel by failing to object to comments the State made in closing argument. He argues the State personally vouched for Hembrough's credibility and suggested the trial judge had already determined Hembrough was truthful.

¶ 150    Prosecutors have wide latitude in making closing argument and "may properly comment on the evidence presented and reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of a witness." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. "However, a prosecutor may not personally vouch for the credibility of a witness or bolster a witness's testimony." *Id.* A prosecutor

- 36 -

does not cross the line of personally vouching for a witness's credibility if the jury has to infer the prosecutor is expressing his personal views. *Gilker*, 2023 IL App (4th) 220914, ¶ 130. Rather, the prosecutor " 'must *explicitly* state that he is asserting his personal views, stating for example, "this is my personal view." ' " (Emphasis in original) *Id.* (quoting *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996)).

¶ 151    A prosecutor's comment during closing argument constitutes reversible error only where the comment was (1) improper and (2) substantially prejudicial. *People v. Williams*, 2022 IL 126918, ¶ 41. The alleged improper remark should not be examined in isolation but rather considered in the context of the entire closing argument. *Gilker*, 2023 IL App (4th) 220914, ¶ 125. This court reviews *de novo* whether a prosecutor's comment during closing argument was improper. *Id.* ¶ 127.

¶ 152    In this case, defendant complains of the following remarks made during the State's rebuttal closing argument concerning Hembrough's plea deal:

> "[Hembrough] accepted that and so if 20 years of your life is gone is a deal, but there was a catch. Not only would he lose 20 years of his life, he had to tell the truth. And if he didn't, that 20 years, it's gone and he's looking at a potential life sentence. And not his version of the truth. Not even what the prosecutors want to hear. The truth. The judge decides that. And so [Hembrough] is not thinking to himself, what can I get away with? He is motivated to be truthful now."

¶ 153    We find these statements fall within the bounds of acceptable comments directed at Hembrough's credibility and the evidence in the case. During the State's redirect examination, Hembrough testified he agreed "[t]o give an honest and truthful statement" in exchange for a 20-year sentence. He testified, if he was not honest and truthful, the State would "revoke the plea, and

[he would] face the full sentence of the charges."

"A prosecutor who causes the promise of a witness to provide truthful testimony pursuant to a plea agreement to be revealed has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth. *** [B]ringing forth such an agreement does not constitute improper vouching for the credibility of the witness." *People v. Garcia*, 231 Ill. App. 3d 460, 473 (1992).

¶ 154    Here, the State's closing argument appropriately recounted the evidence as to Hembrough's plea agreement, including his promise to testify honestly and truthfully. Notably, the prosecutor did not express his personal view as to whether Hembrough fulfilled this obligation under the agreement. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 138.

¶ 155    Furthermore, when viewing the closing argument in its entirety, it becomes apparent the prosecutor's statement was made to rebut the defenses' remarks that Hembrough's testimony was not truthful. See *Marzonie*, 2018 IL App (4th) 160107, ¶ 47 (stating that depending on the context, a prosecutor may respond to comments made by defense counsel that invite a response and comment on the credibility of a witness). In closing, defense counsel attacked Hembrough's credibility, arguing, "You know as well as I do Hembrough's concocting this story so he can get what he wants." Then, defense counsel accused Hembrough of lying throughout the investigation and declared, "He's a liar then. He's a liar now." Additionally, Wykoff stressed Hembrough's lack of credibility in closing, arguing "Hembrough's 100 percent truth is our 100 percent bull crap." The State responded in rebuttal by reminding the jury that Hembrough was now motivated to testify truthfully under the terms of the plea agreement. We do not find that statement in response to defense counsels' assertions about Hembrough's truthfulness amounted to vouching

for Hembrough's credibility. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 139.

¶ 156    To support his claim, defendant relies on cases that are factually distinguishable. In *Marzonie*, the reviewing court found the prosecutor improperly offered his personal opinion on a witness's credibility when he argued the witness's plea deal " 'had nothing to do with this case. She testified she wasn't promised anything, that this case had nothing to do with her case. *You take that as the truth*. There is no evidence stating otherwise, and believe me, if there was, you would hear about it.' " (Emphasis in original.) *Marzonie*, 2018 IL App (4th) 160107, ¶ 58. In *People v. Williams*, 2015 IL App (1st) 122745, ¶ 16, the court found the prosecutor improperly injected his view the witness was truthful by arguing, " 'We don't just take everything he says for truth immediately, we check it out,' 'we corroborate' and 'don't just *** take the word of anyone.' " Unlike *Marzonie* and *Williams*, the State here neither explicitly asserted it was expressing a personal view as to Hembrough's credibility nor made any indication the State possessed information about Hembrough that the jury did not have. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 140.

¶ 157    We also find the State's comment regarding the trial judge did not usurp the jury's duty to assess Hembrough's credibility. Rather, the State was merely explaining to the jury the role of the judge as to the plea agreement. Under the plea agreement, Hembrough agreed to tell the truth during his testimony, and it was the judge who would determine whether Hembrough fulfilled that obligation. The State's comment did not assert the judge had already decided that Hembrough told the truth, nor is there any evidence the judge actually did so. Defendant's argument is, in essence, that the State's comment created an inference from which the jury could extrapolate the judge had already determined Hembrough's truthfulness. However, as discussed above, we will not find reversible error based solely on an inference a jury could have drawn from

a prosecutor's comment. See *Gilker*, 2023 IL App (4th) 220914, ¶ 130; see also *McClain*, 2026 IL App (4th) 250086-U, ¶ 141.

¶ 158        Additionally, the jury received the following instruction:

"Only you are the judges of the believability of the witnesses and of the weight to given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

See Illinois Pattern Jury Instructions, Criminal, No. 1.02. (approved Dec. 8, 2011). Thus, the jury was fully aware of its role as the sole decision-maker as to the credibility of the witnesses. Defendant has failed to establish a clear or obvious error from the prosecutor's argument. Thus, defendant has not shown ineffective assistance of counsel. See *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179; *McClain*, 2026 IL App (4th) 250086-U, ¶ 142.

¶ 159                      B. Comcast Door Log Records

¶ 160        Defendant contends the trial court erred in admitting evidence of the Comcast door log records, which he argues were admitted in violation of Illinois Rule of Evidence 902(11) (eff. Sept. 8, 2018)) because the State failed to disclose its intent to use a certificate of authenticity to authenticate the logs. The court found defense counsel's objection to the evidence was untimely.

¶ 161        As previously noted, we will not reverse a trial court's decision to admit documentary evidence absent an abuse of discretion. *Watts*, 2022 IL App (4th) 210590, ¶ 76. Generally, an objection to the introduction of evidence must be made at the time of its admission or the objection will be treated as forfeited or waived. See *People v. Baynes*, 88 Ill. 2d 225, 230

(1981).

¶ 162 Defendant argues the objection was not untimely under *People v. West*, 294 Ill. App. 3d 939, 942 (1998), because the evidence had not yet been published to the jury when the objection was made. In *West*, the appellate court stated the issue is not whether a party objects to evidence when it is first identified or referred to, but is instead whether an objection is made when the evidence is offered. *Id.* There, the defense objected to the photographs both when they were referred to by various witnesses and when they were offered into evidence. *Id.*

¶ 163 In contrast, here, the evidence was both offered and admitted without objection from defendant, and counsel for McClain withdrew his objection. Defendant did not object at all until a day later. Accordingly, the trial court did not abuse its discretion in finding the objection was untimely and allowing the evidence to remain admitted.

¶ 164 Further, when Sloman later identified the door logs and the State sought to publish an exhibit concerning them to the jury, Wykoff stated he objected and had a continuing objection to use of the logs, but defense counsel did not object. Thus, even if we were to find defense counsel's first objection timely, he then forfeited the matter by not objecting to the exhibit that was published to the jury.

¶ 165 Based on defense counsel's failure to timely object, defendant also asserts defense counsel rendered ineffective assistance of counsel. However, we find defendant cannot show prejudice. A defendant claiming ineffective assistance of counsel based on his trial counsel's failure to object to evidence cannot establish the prejudice prong of the *Strickland* test if the admissible evidence against the defendant is overwhelming or the inadmissible evidence is cumulative of admissible evidence. See *People v. Sample*, 2024 IL App (4th) 230722-U, ¶ 69.

¶ 166 Here, as previously discussed, the evidence against defendant was strong. Further,

the times on the door logs were corroborated by surveillance video from neighboring cameras, the cell phone location records, and Hembrough's testimony, making the evidence cumulative. Defendant argues the door logs ruled out Medley and Brewer as suspects because they showed when those people entered. But Sloman testified surveillance video and reports from other witnesses also corroborated when they arrived at the house. Likewise, other evidence was provided showing Smith and Whiteside were at Flakes's apartment at the time of the murders. Thus, defendant has not shown a reasonable probability the result of trial would have been different had the evidence of the door logs been excluded. For the same reason, even if we were to find any nonforfeited error, we would conclude it was harmless error.

¶ 167                    C. Prior Consistent Statement

¶ 168        Defendant next contends the trial court abused its discretion by allowing Pullings to testify regarding Hembrough's prior consistent statement because Hembrough's motive to lie predated the statement. He also argues counsel was ineffective for failing to request a limiting instruction preventing the use of the statement as substantive evidence.

¶ 169        Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019) provides a witness's prior consistent statement is admissible to rebut an express or implied suggestion on cross-examination the witness is motivated to testify falsely or the testimony is a recent fabrication. *People v. Williams*, 147 Ill. 2d 173, 227 (1991). This exception applies only if "the prior consistent statement was made before (1) the time of the fabrication; or (2) the existence of the motive to lie." *People v. Wheeler*, 186 Ill. App. 3d 422, 427 (1989). Further, a prior consistent statement may only be admitted for the sole purpose of rehabilitating the witness and cannot be used as substantive evidence. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99. A trial court's ruling admitting a prior consistent statement will not be reversed absent an abuse of discretion. *People v. Randolph*, 2014

IL App (1st) 113624, ¶ 16.

¶ 170    Here, during the defenses' cross-examination of Hembrough, defense counsel and Wykoff attempted to damage Hembrough's credibility. On cross-examination, defense counsel questioned Hembrough's motivation in pleading guilty two weeks before the trial and agreeing to testify against defendant in exchange for a 20-year sentence. Additionally, defense counsel also attacked the inconsistencies between Hembrough's statement to police in February 2022 and his trial testimony. Specifically, defense counsel asked Hembrough,

> "And here it is two weeks before trial, on September 6 of 2024, just about three years later, it's at this point, despite all these other lies you told to police officers that now you want to come forward, make a deal with the State, and now you're being candid about this, right?"

Hembrough responded his statement on September 6, 2024, was the same as his statement made in February 2022.

¶ 171    Similarly, Wykoff questioned Hembrough's previous assertions he was not guilty and his motivation to plead guilty shortly before trial. Hembrough stated he had more recently learned he was guilty on a theory of accountability. He stated, before that, he had still believed he could be found not guilty because he was not one of the actual shooters. Wykoff accused Hembrough of repeatedly lying, including during his police interviews and to the jury at trial. Hembrough acknowledged lying in his October 2021 interview but denied lying during his trial testimony. Wykoff then asked, "[Y]ou're a liar, right?" Hembrough responded, "No."

¶ 172    On redirect examination, the State asked, "In order to get 20 years for first-degree murder, was there something you were required to do?" Hembrough responded, "To give an honest and truthful statement." The State followed up, "And if you are not honest and truthful, what

- 43 -

happens to this 20 years?" Hembrough replied, "They revoke the plea, and I face the full sentence of the charges."

¶ 173　　　　The cross-examination of Hembrough about his recent plea deal made Pullings's testimony admissible to rebut the suggestion Hembrough was motivated to testify falsely or that the testimony was a recent fabrication. Defendant relies primarily on the argument that his general motive to lie was already in existence when he talked to Pullings. However, at that time, Hembrough was not a suspect, had not been charged in the offense, and he had seen no discovery in the case. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 121.

¶ 174　　　　Like *McClain*,

"we find it notable the story Hembrough told the police in October 2021 was not the same story he told Pullings. In fact, Hembrough's statements to Pullings were far more inculpatory of his participation in the crime than his statements to the police. In his October 2021 police interview, Hembrough told the police he was not present at 2517 South 10th Street or involved in the crime at all, but he later told Pullings he participated in the robbery and gave him details about the crime that aligned with evidence later found at the scene. Furthermore, Hembrough did not admit to the police he was present for the homicides at 2517 South 10th Street until the February 2022 interview." *Id.* ¶ 120.

On these facts, we cannot conclude Hembrough had a motive to lie when he spoke with Pullings in October 2021. However, once admitted, the testimony could be used only to rehabilitate Hembrough as a witness and not as substantive evidence. *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 49.

¶ 175　　　　Next, defendant argues defense counsel was ineffective for failing to request a

limiting instruction for Pullings's testimony to prevent the jury from considering the evidence substantively, especially when the State referenced Pullings's testimony during closing argument.

¶ 176 Our supreme court has noted that, where the State argues a prior consistent statement is the truth and the jury is not instructed that the evidence should be considered for a limited purpose, the statement is being used as substantive evidence. *People v. Walker*, 211 Ill. 2d 317, 345 (2004). The Appellate Court, First District, has also noted such evidence is likely viewed as substantive when there is no limiting instruction. *Dupree*, 2014 IL App (1st) 11872, ¶ 55. However, where counsel did not specifically object to the evidence being used substantively or request a limiting instruction, the First District has found the matter forfeited. See *People v. Smith*, 362 Ill. App. 3d 1062, 1081-82 (2005); *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 30.

¶ 177 The Appellate Court, Second District, has held, when a prior consistent statement is admitted into evidence, a jury instruction indicating its limited rehabilitative purpose is proper. *People v. Lambert*, 288 Ill. App. 3d 450, 457-58 (1997). This court, in addressing the matter in relation to McClain's appeal, also held a limiting instruction was required and found McClain's counsel's performance was deficient. *McClain*, 2026 IL App (4th) 250086-U, ¶ 123.

¶ 178 The Illinois Pattern Jury Instructions contain no instruction regarding prior consistent statements, but the First District has recommended the following instruction:

> "Members of the Jury, the prior statement of [witness's name] has been admitted for the limited purpose of rebutting a charge that (1) [his/her] [testimony is a recent fabrication] or (2) [he/she] [had a motive to testify falsely]. It may be considered only as it may or may not bear upon the believability of [witness's name]. It cannot be considered by you as independent proof that the defendant committed the crime alleged." *Smith*, 362 Ill. App. 3d 1062, 1083 (2005).

Here, defense counsel objected to admissibility but did not specifically argue the evidence could not be used substantively and did not request a limiting instruction. Thus, defense counsel forfeited the issue. In that regard, defense counsel's failure to request a limiting instruction was deficient representation, especially given the extent of the testimony Pullings provided about details Hembrough told him concerning the crime and the State's reference to Pullings's testimony again in closing. Even if not expressively used substantively by the State, without the instruction, there was a probability the jury could have used it substantively. Thus, defense counsel should have requested an instruction informing the jury to use Pullings's statements for rehabilitative purposes only. Because the jury was not instructed to avoid considering Pullings's testimony as substantive evidence, counsel's representation was deficient. See *Dupree*, 2014 IL App (1st) 111872 ¶ 55; *McClain*, 2026 IL App (4th) 250086-U, ¶ 123. However, having determined counsel's performance was deficient, we must determine whether defendant has shown prejudice. First, the State did not place any improper emphasis on the testimony as substantive evidence that defendant committed the crime, but instead properly used it as evidence Hembrough's testimony was truthful. Second, absent Pullings's statement, as previously discussed, Hembrough's testimony was otherwise corroborated by numerous surveillance videos, cell location data, cell phone call logs, ballistics evidence found at the crime scene, and defendant's own statements. In light of the strong evidence corroborating Hembrough's account and placing defendant at the crime scene at the correct times, defendant has not shown a reasonable probability that, had a limiting instruction been given, the result would have been different. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 124. Accordingly, we cannot conclude defendant has shown prejudice.

¶ 179                    D. Proportionate Penalties Clause

¶ 180          Finally, defendant, who was 20 at the time of the crimes, contends his mandatory

- 46 -

life sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the trial court abused its discretion in sentencing him. He asks this court to either reduce his sentence to a term of years or remand for a new sentencing hearing.

¶ 181 The Illinois Constitution mandates "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *Id.* A statute violates the proportionate penalties clause if " 'the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *People v. Hilliard*, 2023 IL 128186, ¶ 20 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)).

¶ 182 In *Miller v. Alabama*, 567 U.S. 460, 489 (2012), the United States Supreme Court held the eighth amendment (U.S. Const., amend. VIII) prohibits mandatory life sentences for juveniles who commit murder. In cases involving direct appeals, the Illinois Supreme Court has recognized that young adults may rely on evolving neuroscience regarding brain development in juveniles and its correlation to maturity underpinning the *Miller* decision to support an as-applied challenge under the proportionate penalties clause of the Illinois Constitution. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (involving a 19-year-old defendant sentenced to a term of natural life in prison); *People v. Harris*, 2018 IL 121932, ¶¶ 1, 48 (involving an 18-year-old defendant sentenced to 76 years in prison).

¶ 183 Defendant claims his mandatory life sentence violates the proportionate penalties clause as it applies to him because at the time of the offense, he was 20 years old, and he had experienced a difficult upbringing. A constitutional challenge to a statute may be facial or as applied. *Harris*, 2018 IL 121932, ¶ 38. "A facial challenge requires a showing that the statute is unconstitutional under any set of facts, whereas an as-applied challenge is dependent on the

particular facts and circumstances of the challenging party." *People v. Williams*, 2024 IL 127304, ¶ 25. "An as-applied constitutional challenge is a legal question that we review *de novo*." *People v. Spencer*, 2025 IL 130015, ¶ 25.

¶ 184    Here, the trial court sentenced defendant under section 5-8-1(a)(1), (c)(ii) of the Unified Code (730 ILCS 5/5-8-1(a)(1), (c)(ii) (West 2024)). Under section 5-8-1(a)(1), (c)(ii), "the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and *** is found guilty of murdering more than one victim." *Id.*

¶ 185    We conclude the trial court did not abuse its discretion in sentencing defendant to a mandatory life sentence because the court had no discretion to sentence him to anything less under section 5-8-1(a)(1), (c)(ii) of the Unified Code. See *id.*; *McClain*, 2026 IL App (4th) 250086-U, ¶ 148. Regarding defendant's as-applied challenge, we find it is premature.

¶ 186    Courts have emphasized the record must be sufficiently developed to address as-applied challenges, including proportionate penalties arguments based on *Miller* or the developing brains of young adults. See, *e.g.*, *Harris*, 2018 IL 121932, ¶ 46; *Thompson*, 2015 IL 118151, ¶ 37. "[A] reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121392, ¶ 41. "Without an evidentiary record, any finding that a statute is unconstitutional as applied is premature." (Internal quotation marks omitted.) *Id.* ¶ 39.

¶ 187    We find this court's reasoning in *People v. Moore*, 2025 IL App (4th) 240592-U, instructive. The defendant in *Moore* was 18 years old when he committed first degree murder and was sentenced to 80 years in prison. *Id.* ¶ 2. The "[d]efendant's trial counsel emphasized [the] defendant's youth at sentencing and in a motion to reconsider." *Id.* ¶ 35. The PSI documented the

defendant's lead poisoning diagnosis, various mental health disorders, and qualification for special education programs. *Id.* On appeal, the defendant argued the PSI rendered the record sufficient to evaluate his proportionate penalties clause claim, and in the alternative, any insufficiency in the record was due to counsel's ineffectiveness. *Id.* ¶¶ 35, 41. This court held the PSI and the attached records were insufficient to address the defendant's claim, as "written documentation in a PSI showing [the] defendant's mental impairments does not eliminate the need for sworn testimony and factual findings specifically addressing the basis of the as-applied challenge." *Id.* ¶ 40 (citing *People v. Landerman*, 2018 IL App (3d) 150684, ¶ 56). As to the ineffective-assistance claim, this court found the defendant's argument was premature because the court could not evaluate whether the defendant was prejudiced "without knowing what testimony or other evidence counsel could have provided." *Id.* ¶ 44.

¶ 188        Here, the record is even more sparse than the record in *Moore*, containing "only basic information about defendant, primarily from the [PSI]." *Harris*, 2018 IL 121392, ¶ 46. The record contains no data on the evolving science of juvenile maturity and brain development, nor how that science applies to defendant's specific circumstances. At sentencing, no sworn testimony was presented, and the trial court made no factual findings addressing defendant's proportionate penalties clause claim. Further, although Wykoff briefly referenced the proportionate penalties clause in his argument at sentencing and asked the court to sentence McClain accordingly, McWard presented no such argument. Accordingly, we find the record is insufficient to address defendant's as-applied constitutional challenge. We also note the fact that defendant filed a motion to reconsider is immaterial. *People v. Brown*, 2026 IL App (4th) 240920-U, ¶ 76. Therefore, we find defendant's as-applied challenge premature. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 151. Because the defendant's as-applied challenge is premature, defendant is not precluded from

raising it in a postconviction petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)), where he can provide sworn testimony and evidence specific to his claim. See *McClain*, 2026 IL App (4th) 250086-U, ¶ 154.

¶ 189                                   III. CONCLUSION

¶ 190          For the reasons stated, we affirm the trial court's judgment.

¶ 191          Affirmed.